Laeamobe, Judge,
delivered the opinion of the court:
This is an action, brought under a special jurisdictional statute, based on a contract for the installation of flood control conduits and sewers in Cumberland, Maryland. Plaintiff’s claim embraces seven different items, all basically involving extra work which it allegedly was required to perform, plus a claim for an additional period of time for contract completion.
The questions presented by each item of the claim are: (1) whether the record establishes that the adverse decisions of the head of the department on plaintiff’s claims were deprived of finality; (2) whether, regardless of the finality of the board’s decisions, the present record establishes that plaintiff was required to do work not called for by the com tract and specifications; (3) whether the record establishes that plaintiff’s delay in completion was excusable, so that liquidated damages assessed against it should be remitted.
Defendant contends that the decision of the Corps of Engineers Claims and Appeals Board, which was adverse to plaintiff on all of its claims, is final and conclusive. The argument of the Government is that under the so-called Wunderlich statute, 68 Stat. 81, plaintiff must allege and prove at least one of the statutory elements therein contained ; i.e., that the decision shall be final unless fraudulent, capricious, arbitrary, or so grossly erroneous as to necessarily imply bad faith, or is not supported by substantial evidence. Volentine and Littleton v. United States, 136 Ct. Cl. 638; Fehlhaber Corporation v. United States, 138 Ct. Cl. 571 cert. denied 355 U.S. 877. With this argument we agree.
While the petition leaves something to be desired by way of specificity, the petition does allege, following a statement of plaintiff’s claims, that the decisions on each and every claim were- capricious, arbitrary, or so grossly erro *43 neous as necessarily to imply bad faith, or were not supported by substantial evidence. Since no attack was made on the petition, we regard the facts well pleaded.
Defendant then contends that in this case the plaintiff has failed to establish such factors; i.e., that the commissioner made no findings which expressly or by implication establish that the decision of the head of the department was fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, and that plaintiff has not excepted to the report of the commissioner or requested the court to make such a finding.
Whether an ultimate finding in this regard is necessary, or indeed whether such a finding is propitious, has been the subject of much debate. The view is taken by some that such an ultimate finding is a conclusion of law which should be drawn from the general findings. Others take the position that such a finding is a mixed question of law and fact. Still others believe that the findings should in so many words show that the action was arbitrary, etc., before recovery can be had.
While there is much merit in each position, it is our judgment that the court must look to the findings and from them determine whether the decision of the head of the department was fraudulent, capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. Accordingly, each item of the claim will be discussed separately in the order presented by the petition.
Item A is a controversy over whether some of the sheeting and shoring, which was classified by the contracting officer as type “B”, should be paid for at the unit price applicable to such sheeting and shoring; i.e., $0.30 per square foot. Plaintiff claims the payment should have been made under the price applicable to type “A”; i.e., $2 per square foot.
The two types are described in the specifications in the following terms:
(1) Type “A” shall be used at the locations indicated on the drawings where, in order to provide adequate protection, it is necessary to drive a continuous dia *44 phragm of timber or steel sheeting to the required depth in advance of excavation and to support such sheeting in place with waling, bracing, and shoring as the excavation progresses.
(2) Type aB” sheeting and shoring shall be used where and as determined by the Contracting Officer in lieu of Type “A” in all areas where no danger of sliding or caving in of the earth is anticipated during excavation operations. Type “B” sheeting and shoring shall be placed as the excavation progresses.
As can be observed, type “A” was to be used at locations indicated on the drawings, while type “B” was to be used where and as determined by the contracting officer. Type “A” was to be driven to the required depth in advance of excavation and supports placed as excavation progressed. Type “B” was to be placed as the excavation progressed. Type “A” was to be a continuous diaphragm of timber or steel sheeting, but the specification defining type “B” contains only the general requirement that all such sheeting and shoring shall be used in lieu of type “A” where, as determined by the contracting officer, there is no danger of sliding or caving of the earth during excavation operations.
Thus the contracting officer, not the contractor, was to determine which type was to be installed and, in addition, type “A” was to be driven in advance. As a matter of fact, the contracting officer at all times took the position that type “A” must be driven in advance and in such places as was indicated on the drawings.
There is no question from the facts in this case that the contractor determined that in certain locations there was danger of sliding and this determination was made after partial excavation by a backhoe. Having partially excavated, the contractor then drove sheeting and claims payment as type “A”. That this was not the province of the contractor is clear from the specifications.
In all locations where plaintiff, after partial excavation, drove sheeting and installed a continuous diaphragm, it was paid for as type “A”. It is those locations where, after excavation by the backhoe to a depth of 4 to 6 feet and sometimes deeper, plaintiff installed continuous sheeting, even though it never drove one foot, that the shoring was classified *45 and paid for as type “B”, for which plaintiff is claiming payment as type “A”.
As stated earlier, the defendant had the contractual right to specify the types of sheeting to be utilized and plaintiff had the duty to comply. So when the plaintiff did not drive the sheeting, for which a compensation is claimed, it is not entitled to payment for this type of sheeting. When the head of the department, following the dictates of the contract, found the above facts existed and ruled that payment would not be made on the basis of type “A”, such decision cannot be said to be arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence. Accordingly, plaintiff is not entitled to recover on this item of its claim.
Item B is for compensation in excess of the contract price of $3 per yard for some of its excavation. In the second part of this claim, plaintiff seeks compensation for excavation beyond the neat lines ordered.
Respecting the claim for compensation in excess of the contract price of $3 per yard, the findings show that plaintiff was paid for about three times as much type “A” sheeting as had been originally estimated and defendant concedes that “it seems reasonable to conclude that this made plaintiff’s actual cost of excavation greater than it had been estimated to be.” This is so because the contract specified only a single type of “unclassified” excavation for which plaintiff bid the unit price of $3 per yard. This excavation, depending upon the condition, could be done with different types of equipment, which would have differing costs of operation. Excavation for type “A” sheeting, to the extent that it was done after the sheeting had been driven, had to be performed by cranes and to some extent by hand rather than the use of a less expensive backhoe.
Defendant has accepted the result reached by the commissioner as to the additional compensation justified and, accordingly, we hold that plaintiff is entitled to recover on this portion of item B of its claim in the amount of $6,510.
The second part of its claim under item B is for excavation beyond neat lines. Plaintiff excavated beyond the neat lines ordered for the alleged reason that it was for the pur *46 pose of avoiding the necessity of installing sheeting and shoring. This was not successful so the contractor overcut in order to be able to put in type “B” sheeting.
Plaintiff argues that but for this over-excavation it would have had to install type “A” sheeting and seeks to recover the difference in cost of the two types for a claimed quantity of 4,244 square feet of shoring.
The Corps of Engineers Claims and Appeals Board denied this claim by stating:
ij: ijs * * sfs
As to those instances in Wineow and Knox Streets, where claims are filed for reimbursement for additional grading, this Board finds that there has been no showing that the contracting officer directed the side sloping of the excavation in lieu of sheeting. With respect to the extra grading on Knox Street, the contracting officer finds, and no showing has been made to support a contrary view, that the removal of this material was not directed. Under such circumstances, claim for the additional excavation at these two points can not be allowed.
* ❖ * % *
Concededly, plaintiff did make this extra excavation, but there is no evidence that this side sloping was ordered and no evidence that the contracting officer would in fact have directed the installation of type “A” shoring had plaintiff not done this over excavation. As a matter of fact, the over excavation was done by plaintiff in its own interests. This is borne out by plaintiff’s letter to the Corps of Engineers, dated April 2, 1949, which states: “we are doing everything possible to do away with type “A” sheeting became it hampers our progress * *
In conclusion, plaintiff has failed to establish any basis for recovery of this portion of its claim under item B, and we can find nothing arbitrary or capricious in the decision denying this item of the claim.
Under item C, plaintiff is claiming 26% days’ extension of time and additional costs of $11,892.25. This claim is based on the alleged fact that it was necessary for work to be done across a street in a manner which permitted traffic to be maintained while the work was in progress. In addi *47 tion, there were railroad abutments and buildings very close to the excavation. There is no question but that this portion of the work progressed more slowly than the remainder of the excavation. However, plaintiff complains because the contracting officer did not authorize the use of underpinning to support the adjacent buildings. Actually, type “A” sheeting was authorized and installed in this area.
In practice this work was no more difficult to perform than was contemplated at the time the plans and specifications were prepared, nor was it more difficult than at the time the plaintiff’s president made his pre-bid survey. Consequently, since there was no contract bid item for underpinning, the contracting officer was within his rights in forcing the contractor to do this portion of the work in accordance with the contract and specifications. Accordingly, the decisions of the Claims and Appeals Board in denying this claim on those grounds could not be deemed to be arbitrary, capricious, or so grossly erroneous as to imply bad faith, or not supported by substantial evidence.
Item D is a claim for costs occasioned by placing trap rock in the bottom of the trenches.
The facts pertaining to this claim are these: Under contract specification SC-23 plaintiff was obligated, unless otherwise specifically authorized, to construct all permanent structures in the dry. This specification provided for construction of coffer dams, diversion channels, drains, flumes or other temporary structures and such pumps as may be necessary for unwatering the foundations and work areas. All such structures were subject to the approval of the contracting officer, but such approval did not relieve the contractor of responsibility for the adequacy of the work. This specification also provided that no separate payment for the above work would be made, but the cost thereof would be included in the contract unit prices for the various items of the permanent work.
In lieu of the dewatering process outlined above, plaintiff placed a fine layer of rock in the bottom of the trenches. The contractor was advised at the very outset that this was not a pay item, but nevertheless it continued to spread the rock. Plaintiff now seeks payment for this rock.
*48 The placing of this material was not only not provided for in the contract, but was not ordered by the defendant’s project engineer. Hence we can find no fault with a decision holding that the contractor must give the defendant the system it specified. In other words, plaintiff undoubtedly did place the rock claimed and it probably was successful in dewatering, but it just was not in conformity with the contract and is not an item for which additional pay could be claimed.
Item E is a claim for a time extension because of alleged delay in approval by defendant of the coarse aggregate.
In respect to this claim, plaintiff contends that under the contract provisions the defendant indicated that this coarse aggregate could be procured from available suppliers within a five-mile radius of the construction area. Plaintiff says it was delayed because, as stated in plaintiff’s brief, “it was the failure of the supplier to perform, and not the plaintiff, that caused the delay.” Since the delay was not the fault of the contractor, it contends for a time extension equal to the delay of his subcontractor.
The short answer to this claim is that, as admitted by plaintiff, the delay was occasioned by the resulting controversy between the supplier and the contractor and not the Government. Additionally, as represented by defendant, a source of supply was within a five-mile radius, and had plaintiff contacted defendant’s engineer it would have learned that at least three sources capable of supplying suitable material were operating within the prescribed area.
Under these circumstances, we can find no error in the decision denying this item of the claim and, consequently, plaintiff is not entitled to recover herein.
Item G is a claim for damage to the project because of a flood. The contract provision regarding this claim is as follows:
SC-20. Damage to work. The Contractor shall be responsible for all work until completion and final acceptance thereof. However, if, in the judgment of the Contracting Officer, any part of the permanent work performed by the Contractor is damaged by flood, which damage is not due to the failure of the Contractor to take reasonable precautions or to exercise sound engi *49 neering and construction practice in the conduct of the work, additional payment for the repair of such damaged permanent work as ordered by the Contracting Officer will be made at the applicable contract unit or lump sum prices as fixed and established in the contract, which shall be full compensation therefor. If, in the opinion of the Contracting Officer, there are no contract unit or lump sum prices applicable to a part of such work, an equitable adjustment pursuant to Article 3 Changes of the contract will be made as full compensation for the repairs of that part of the permanent work for which there are no applicable contract unit or lump sum prices. Except as herein provided, damage to all work, (including temporary construction) utilities, má-terials, equipment and plant shall be repaired to the satisfaction of the Contracting Officer at the Contractor’s expense, regardless of the cause of such damage.
The facts respecting this claim are these: Concrete conduits were planned and placed in the trenches as a part of the flood control project. These were constructed in two parts, the lower part being the invert. Imbedded reinforced steel was used in forming the concrete walls. The forms, into which the concrete was placed, were not a part of the permanent structure and were removed after serving the purpose for which intended.
In excavating, dirt and other loose materials were left by plaintiff on top of the valance. This was washed by the floods into the construction together with silt and other debris. The damage done by the flood was that silt was poured into the concrete conduits, the reinforcing rods were bent and had to be straightened, and some forms were washed downstream.
On June 17, 1949, Dickson ascertained from the Weather Bureau that there would be heavy rains, and immediately notified plaintiff, warning of a possible flood. The defendant’s engineers did not specify the exact type of protection which should be placed, but warned that heavy water was expected.
■ On Friday, June 18, 1949, when rain was falling heavily at Wineow Street duringthe morning, most of plaintiff’s men were sent home. The contracting officer’s representative tried to contact Mr. Scutieri to inform him that he should *50 take some steps to protect his project, but he was not at the jobsite. Plaintiff’s supervisor, Stinson, was contacted and informed that steps should be taken because of the heavy rain. Despite this warning, no appropriate steps were taken by plaintiff to protect the equipment and work.
On the nest day, June 19,1949, Stinson was again notified that he should take steps to protect the project. Stinson went down to the river where plaintiff had some pumps to try to remove them. This attempt was unsuccessful, as water was close to the top of the pumps. Stinson removed the magnetos from the pumps.
After the June 18-19, 1949, flood at the end of Wineow Street, there was no indication that plaintiff had done anything prior to the flood to prevent inundation. Plaintiff should have followed the usual custom and put a built-up section at that point; he could have put a dirt levee or sandbagging to an elevation of about three or four feet in order to get the additional protection he needed. This is considered to be sound construction practice.
Plaintiff contends that it had taken dirt from the excavation and piled it on both sides of the excavation for several feet; that there was a higher area between its excavation work and the side of the river; that on the canal side plaintiff had one permanent pump and at times three or four pumps to take care of its surface water. Plaintiff also contends that building dikes would have given it no protection from the canal side and if it built a dike on the river side it would not have have stopped the river water from entering the trenches.
The evidence further shows that plaintiff failed to take adequate steps to guard the flood control project from flood water during excavation and performance of other work on the project.
Plaintiff presented its claims arising from the flood, which claims were rejected by the contracting officer. The Corps of Engineers Claims and Appeals Board affirmed the action taken by the contracting officer. We can find nothing arbitrary or capricious in this decision. Consequently, the decision is final and conclusive and plaintiff is not entitled to recover on this item.
*51 Item H is a claim for the sum of $2,543.20 because the defendant refused to allow plaintiff to mix its concrete in transit from its supplier to the location where the concrete was to be used. Plaintiff contends that it lost the time advantage of mixing while in transit, and that it was required to mix batches of concrete for periods ranging from 8 to 12 minutes rather than two minutes as provided for in the specification.
Specification TP4-10b does provide for mixing time of two minutes and mixing in transit. However, the same specification provides:
The mixing periods specified are predicated on proper control of the speed of rotation of the mixer and of the introduction of the materials, including water, into the mixer. The mixing time may be increased when, in the opinion of the Contracting Officer, the charging and mixing operations fail to result in the required uniformity of composition and consistency of the concrete or when test samples of concrete taken from three locations, such as front, center, and back of the mixer show a difference of more than ten (10) percent in the sand-cement or water-cement ratios. * * *
The facts show that plaintiff used Jaeger mixing trucks of a type shown in Joint Exhibit 18, a brochure prepared by the manufacturer of the Jaeger mixers. (Finding 68.) This brochure recommended mixing time of six minutes for new equipment. The equipment used in this job was old, and it took twelve minutes’ mixing time to get the quality required for the job. If there had been mixers that would have accomplished it in less time, the inspectors would have been satisfied with less mixing.
This claim was also denied by the Corps of Engineers Claims and Appeals Board stating among other things:
* * * The Government introduced evidence of the need for proper mixing, including the correct water-cement ratio; that the mixers used were old, and worn, and in generally poor condition, particularly as to the blades; that tests proved 12 minutes the minimum time thoroughly mixed concrete could be obtained without “dust explosion,” and larger stones coming out of the mixer last. Evidence was introduced to show that the appellant was informed of the poor condition of the mixers, *52 with, a suggestion that it be taken up with supplier of concrete.
From the facts relative to this claim it is quite apparent that plaintiff was forced to do exactly what the contract specifications called for and nothing arbitrary and capricious can be gleaned from the denial of this part of plaintiff’s claim. Consequently, we hold that plaintiff is not entitled to recover on this item.
Over and above the additional costs sought, plaintiff is seeking recovery of moneys withheld as liquidated damages on the theory that the delays were excusable. Plaintiff is claiming a total delay in connection with items A, C, and E, of 185% days. Quite apparently plaintiff was excusably delayed to some extent. However, it is rather difficult from the record to say exactly to what extent the delay was caused by the defendant and to what extent the delay was caused by plaintiff’s own conduct.
The trial commissioner who heard the witnesses and had an opportunity to evaluate the testimony of each, has found that the record supports a finding that an additional 100 days should have been allowed to complete the job.
The plaintiff has not excepted to this finding. However, the defendant has excepted and requests a finding that a time extension of 30 to 33 days should have been allowed.
Defendant complains that commissioner’s finding 16 is incomprehensible and should be eliminated. We do find it extremely difficult to follow the mathematical formula of this finding. However, we also find it difficult to follow the reasoning of defendant in this respect.
After considering confusing evidence as best we can, our judgment as to the justifiable time extension is this: Under item A plaintiff should have been granted 87 days as a result of additional type “A” sheeting required. Accordingly, the defendant’s exception to finding 72 is allowed to this extent.
Plaintiff was delayed under item C. However, as disclosed earlier, the slowness of this portion of the work was contemplated and foreseeable and was not the fault of the Government.
Again plaintiff was delayed in obtaining approval of coarse aggregate. This delay as previously stated was entirely the *53 fault of the contractor. The coarse aggregate was available and ultimately, after a controversy between plaintiff and its supplier, was obtained exactly in conformity with, the contract instructions.
Again, as stated previously, if plaintiff was delayed by additional concrete mixing time, it was the fault of its equipment rather than something extra demanded by the Government.
Since the defendant withheld from plaintiff $200 per day as liquidated damages, and since in our judgment this withholding was erroneous to the extent of 87 days, plaintiff is entitled to recover $17,400 of the liquidated damages withheld.
In conclusion, plaintiff is entitled to recover under item B compensation in excess of the contract price in the amount of $6,510. Plaintiff is further entitled to recover $17,400 under item A based on the erroneous withholding of liquidated damages of 87 days. Therefore, judgment will be entered for plaintiff in the total amount of $23,910. On all other aspects of plaintiff’s claim, we hold that the decision of the Corps of Engineers Claims and Appeals Board is final, since the same is not fraudulent, capricious, arbitrary, so grossly erroneous as necessarily to imply bad faith, and is supported by substantial evidence. As to them, the petition will be dismissed.
It is so ordered.
Davis, Judge; Dtjrfee, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE EAOT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition in this action was filed pursuant to Private Law 85-434, 72 Stat. A45 (1958), H.R. 5355, 85th Cong., 2d Sess., reading as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims, notwithstanding any prior determination by such court on a motion for summary judg *54 ment,- or any other provision or rule of law-to the contrary, to hear de novo, determine, and render judgment upon all claims of the United Foundation Cor- § oration of Union, New Jersey, against the United tates, arising out of contract numbered W-49-080eng-668 entered into between the said corporation and the United States on September 30, 1948, and such claims shall be considered as if they had arisen subsequent to the enactment of the Act entitled “An Act to permit review of decisions of the heads of departments, or their representatives or boards, involving questions arising under Government contracts” approved May 11, 1954 (41 U.S.C., secs. 321 and 322): Provided, That the enactment of this legislation shall not be construed as an inference of liability on the part of the United States Government.
Sec. 2. Suit upon such claims may be instituted at any time within ninety days after the date of enactment of this Act.
Approved June 20, 1958.
The law was reported out by the House of Eepresentatives in H. Eept. 2343, 84th Cong., 2d Sess., which report is in evidence as Joint Exhibit 22.
2. Plaintiff United Foundation Corporation is a corporation duly organized and existing under the laws of the State of New Jersey, and its president and general manager is Philip Scutieri.
3. Plaintiff received an invitation to bid from defendant, acting by and through the Corps of Engineers, United States Army, on July 30,1948, and pursuant to such invitation submitted a bid to the contracting officer. The bids were opened September 14, 1948, and plaintiff, being the low bidder, was awarded unit price contract W-49-080-eng-6G8 in the amount of $273,916.50 for the Local Flood Protection Project, Pressure Conduits and Sewers — Group No. 1, Cumberland, Maryland, and Eidgley, West Virginia, on September 30, 1948. Notice to proceed with the work involved was given to plaintiff October 13, 1948, requiring that work begin October 25,1948.
' 4. The work accomplished pursuant to the contract was accepted as satisfactorily completed by the defendant on November 17, 1949, 97 days after the date fixed by the contract, as amended, for completion. Defendant withheld *55 from plaintiff as liquidated damages tbe sum of $19,400, computed at $200 per day for 97 days. Defendant also withheld $100 otherwise due plaintiff, on final estimate, because the Corps of Engineers Claims and Appeals Board determined that the contractor had been overpaid.
5. In view of the evidence presented during the trial of this suit, plaintiff amended the petition on June 22, 1960, reducing the number of its separate and severable claims under the contract to the following items:
A. Sheeting and Shoring
B. Additional Excavation for Type “A” and Type “B” Sheeting
C. Underpinning
D. Trap Eock
E. Coarse Aggregate for Cement
G. Floods
H. Mixing Time
Item A, sheeting and shoring, was amended to include a request for 87 days of additional contract completion time. Items F and I in the petition were withdrawn.
ITEM A. SHEETING AND SHORING
6. For bidding purposes, and later as part of the contract, a unit price schedule was agreed upon between the plaintiff and defendant which contained the following as item 3:
Sheeting and shoring Estimated quantity Unit Unit price
Type“A”_. 7,600 Square foot-. $2.00
Type“B”_. 62,200 _do_ .30
Type “C”-. 400 _do_ 6.00
There is no dispute involved with respect to type “C” sheeting and shoring. The specifications relating to type “A” and type “B” sheeting and shoring provided as follows:
TP 1-03. SHEETING AND SHORING, a. Scope. The Contractor shall furnish and place such sheeting, shoring, bracing or other supports as are indicated on the drawings or directed by the Contracting Officer for protection of the work and adjacent property. Sheeting and shoring according to use are divided into three types and designated as Type “A”, Type “B”, and Type
*56 “C”. Each type shall be of proper strength and design to provide adequate protection in the location used. The right is reserved to require such sheeting and shoring to be left in place as may be deemed necessary for the safety of the work and adj oining property._
(1) Type “A” shall be used at the locations indicated on the drawings where, in order to provide adequate protection, it is necessary to drive a continuous diaphragm of timber or steel sheeting to the required depth in advance of excavation and to support such sheeting in place with waling, bracing, and shoring as the excavation progresses.
(2) Tyye UBV sheeting and shoring shall be used where and as determined by the Contracting Officer in lieu of Type “A” in all areas where no danger of sliding or caving m of the earth is anticipated during excavation operations. Type “B” sheeting and shoring shall be placed as the excavation progresses.
*****
b. Procedure. The Contractor’s design and schedule of safe operational placing sequence for sheeting and shoring in relation to excavation removal shall be approved by the Contracting Officer prior to placement, but such approval shall not relieve the Contractor of his full responsibility for the safety of the work and adjacent property, protected by such sheeting and shoring. The sheeting and shoring shall be constructed to provide adequate working clearance for construction operations, proper bracing for stability and safe working conditions. When sheeting and shoring have served their purpose, and their removal is approved by the Contracting Officer, they shall be removed and disposal made. Whether sheeting and shoring are removed or left in place all adjoining earth cavities shall be adequately filled. When approved by the Contracting Officer sheeting and shoring may be used in lieu of excavation to the established payment lines.
c. Measurement. Sheeting and shoring will be measured by the square foot of protected area measured for the length of excavation trench or pit and between the established bottom grade of the contiguous excavation and elevation of the original ground, or the top grade of sheeting when so indicated on the drawings or established by the Contracting Officer.
d. Payment. Except as hereinafter specified, payment for all costs of furnishing and placing of sheeting and shoring as indicated on the drawings or directed by the Contracting Officer whether removed or left in *57 place will be made at the applicable contract unit price for “Sheeting and Shoring,” Item No. 3a, Type “A”, or Item No. 3b, Type “B”, or Item No. 3c, Type “C”. Where with the approval of the Contracting Officer sheeting and shoring are used at the Contractor’s option, in lieu of excavation to the established payment lines, no separate payment for sheeting and shoring will be made, but payment for exacavation will be to the payment lines indicated on the drawings as though the cut had been made to such payment lines. For sheeting and shoring specifically directed by the Contracting Officer to be left in place additional payment will be made at the rate of 50 percent of the applicable unit price.
Additionally, there was incorporated in the contract, by reference, the “War Department — Corps of Engineers, United States Army, Safety [Requirements,” which provided, in part:
SECTION 0 8-TRENCH EXCAVATION- — -8 304.08
F. Trenches in partly saturated, filled or unstable soils or where running material is encountered, such as quicksand, loose gravel, loose shale, or completely sat-úrated material, the sides of the trenches 4 feet or more in depth shall be secured by the use of continuous ver-tióle sheet piling and suitable braces. In trenches over 4 feet in depth wooden sheet piling shall not be less than 2 inches in thickness.
G. Sheet piling shall be held in place by longitudinal beams at vertical intervals of 4 feet. The longitudinal beams shall in turn be supported by the cross braces or struts spaced a maximum of 4 feet. The longitudinal beams shall be in no case less in strength than that of a 4- by 4-inch beam; and when the longitudinal distance between cross braces or struts exceeds 4 feet and less than 6 feet, the longitudinal beam shall be not less than a 4- by 6-inch beam.
H. Vertical braces and longitudinal beams in trenches shall be supported by horizontal cross braces or struts, screw jacks, or timber placed at right angles to both braces, cleated and rigidly screwed or wedged. The timbers or struts shall be not less in strength than the following trade sizes:
sf? Hí ifc ❖
K. Additional precautions by way of shoring and bracing shall be taken to prevent slides, or cave-ins, *58 when excavations or trenches are made in locations adjacent to backfilled excavations or subjected to vibrations from railroad or highway traffic, the operation of machinery, or any other source.
The above-quoted sections are considered to describe type “A” sheeting, as set forth in the contract specifications above, while the following quoted section “E” is considered to describe type “B” sheeting :
E. Trenches over 8 feet in length and 5 feet or more in depth in hard compact material, shall be braced at intervals not exceeding 8 feet, with 2-inch by 6-inch planks, or heavier material, placed vertically in the trench opposite each other, backed up by 2-inch by 10-inch planks bearing against the walls at the same intervals as cross braces, struts, or trench jacks. These braces shall, if possible, extend to the bottom of the trench and be supported by horizontal cross braces or struts. Bracing and shoring of trenches shall be carried along with the excavation and must in no case be omitted, except where a mechanical digger is used, the shoring shall be placed within 6 feet of the lower end of the boom. Undercutting shall not exceed 6 inches on either side of the trench.
7. Beports concerning various core borings were furnished to plaintiff by the defendant in the contract documents indicating that cinders, boulders, and debris would be encountered in the excavation for the sewers. Plaintiff does not contend that the core borings were inaccurate, but that such borings did not indicate the stability or lack of stability of the soil. However, since the unit price schedule included quantities of 7,600 square feet for type “A” sheeting and 52,200 square feet for type “B”, and a designation on the drawings of the four locations where such type “A” sheeting was to be placed, plaintiff relied upon defendant’s estimate as to the quantities of the two types of sheeting in making the bid.
8. The record shows that 22,371.12 square feet of type “A” sheeting was placed and paid for at the unit price of $2 per square foot, and 32,163.88 square feet of type “B” sheeting was placed and paid for at the unit price of 30 cents per square foot. Plaintiff’s claim is that an additional 19,015.54 square feet of the sheeting classified and paid for as type *59 “B” should have been classified and paid for as type “A” thereby entitling plaintiff to $1.70 per square foot additional.[1] Plaintiff agreed to accept defendant’s measurement figures of square footage as being more accurate, and accordingly Exhibit A to plaintiff’s petition should be considered as amended, and the dollar amount of the claim reduced from $34,618.80 to $32,326.42.
9. Defendant denied payment at the unit price of $2 per square foot at locations where type “A” sheeting was ordered and utilized, but plaintiff had failed to drive the sheeting ahead of excavation, or, where type “B” sheeting was ordered (i.e., driving ahead not required), and plaintiff had demanded the higher payment because it had placed a continuous diaphragm of sheeting. By agreement of the parties the total amount involved is 19,015.54 square feet, and this was placed at locations on Franklin, Knox, Pear, and Wineow Streets.
10. Apparently defendant utilized a unit price contract and required different unit prices on the two types of sheeting because it could not be determined in advance with complete accuracy what the stability of the soil would be in the various localities involved. The specifications provided that “Each type shall be of proper strength and design to provide adequate protection in the location used.” It was soon discovered that, because of the danger of slides, additional type “A” sheeting over and above that indicated on the plans and included in the estimate would be required. Plaintiff would prepare and present for approval the method by which it was planned to proceed with the work and the type of sheeting proposed for installation at a specific location. During the period of performance of the work pursuant to the contract a number of communications passed back and forth between plaintiff and defendant. Plaintiff would point to the danger from possible slides and insist on type “A” sheeting and the defendant would indicate its appraisal of the situation. One such letter, written by the contracting officer under date of May 12, 1949, interpreted *60 the contract designation of the two types of sheeting as follows:
‡ ‡
The basic controlling difference as stated in the specifications between Type “A” and Type “B” is that Type “A” sheeting is driven before excavation and Type “B” is for placing after excavation has been made. This requirement simply means that to the extent practicable the sheeting will be driven in advance of excavation. As a practical matter it may be necessary at times in the Type “A” sheeting locations to excavate boulders and debris which prevent driving of this sheeting in advance of excavation.
A careful analysis of the specifications for requirements of Type “B” sheeting clearly shows that under this type the sheeting required to be placed after excavation must be adequate for protection of the work and adjacent structures. This may vary from a continuous sheeting to a system of open bracing, all of which is dependent on field conditions determined as the work progresses.
$ ‡ *
11. Making provision for the use of two different types of sheeting, as was done in the specification applicable here, was somewhat unusual. The specifications were changed for subsequent work on this same project for other contractors to eliminate the provision calling for such types. Descriptive terms concerning sheeting and methods of installation are commonly known in the industry. The type “B” sheeting is frequently referred to as “skeleton” or “butterfly” type of sheeting, and is that type which is installed where “no danger of sliding or caving in of the earth is anticipated during excavation operations.” The vertical sheeting would ordinarily be expected to be from four to six to eight feet apart, with appropriate cross bracing to prevent lateral movement of the soil. This would correspond to the description of sheeting or bracing in section 08E of the Safety Manual set forth in finding 6. Type “A” sheeting, on the other hand, must be a “continuous diaphragm of timber” driven in advance of excavation, and is to be supported by waling, bracing, and shoring as the excavation progresses.
*61 12. It was recognized by the contracting officer in his decision of May 12, 1949, that wooden sheeting could not be driven though boulders or certain other types of obstructions, or when certain soil conditions were encountered, and accordingly used the phrase “to the extent practicable, the sheeting will be driven in advance of excavation.” This appears to 'be a reasonable interpretation of a specification to meet actual field conditions as they existed.
13. Plaintiff placed its sheeting in the following manner: A 'backhoe was utilized to excavate to a depth of some four to six feet, or deeper in some instances, prior to placing any sheeting. If a street was crossed, paving breakers would cut through the existing paving. After reaching this depth a determination would be made as to whether the ground appeared stable enough to remain in a vertical cut without danger of slides or danger to existing structures. If the earth showed signs of crumbling, the bottom rung of walers and structures would be placed and a second set of walers and timbers placed at approximately ground level. This created a so-called box approximately 20 feet long, the width of the trench, and some four to six feet in depth. The sheeting was then placed between the walers and the respective sides of the trench, the voids behind the sheeting were filled, and the sheeting driven with a sheeting hammer. A crew of two men stationed on top of the trench continuously drove the sheeting with the pneumatic air hammers, a crew of two or three men worked in the trench guiding the sheeting, and the crane then followed with its crew, consisting of an operator, an oiler who acted as a signal man, and two laborers who guided the clamshell into place and excavated by hand where it was difficult or impossible to reach with the clamshell. If the ground appeared to be sufficiently stable, plaintiff would excavate to the entire depth of the trench with the backhoe and then place type “B”, or skeleton type, sheeting after the excavation was completed. No dispute arose 'between the parties with respect to this type of placement. It was in connection with those areas where it was determined by plaintiff that there was danger of slides and a continuous diaphragm of wood sheeting was placed, followed by excavation with a clamshell, that a dispute arose as to payment. Plain *62 tiff claimed payment for type “A” sheeting in the locations described in finding 9. Defendant claims that the sheeting was not driven “in advance of the excavation” and that therefore such sheeting is type “B”, rather than type “A”, because the wording of the contract as to type “B” sheeting does not exclude the possibility of a continuous diaphragm and permits the placement of sheeting after excavation is completed.
14. The testimony on the question of whether plaintiff drove its sheeting in advance of excavation is quite voluminous, but there appears to be agreement on the following facts:
A. No serious accident happened to any workman, nor did any buildings or structures collapse as a result of the plaintiff’s operations.
B. Plaintiff carried full coverage of insurance running to third parties in the event of any lateral movements of soil causing damage because of a failure of plaintiff to properly perform the excavation and use appropriate sheeting and shoring.
C. All of the sheeting now in dispute, placed at the locations designated in finding 9, consisted of continuous diaphragm wood sheeting, as required by the specifications, and was ordered and directed by Mr. Dickson, the defendant’s project engineer. Plaintiff’s witnesses testified that, insofar as practicable, all of the sheeting in dispute was driven in advance of excavation. Witnesses for the defendant testified that the sheeting in dispute was not driven in advance of excavation.
15. In construction work which includes excavation it is seldom that uniform conditions are found in the subsurface excavated. It appears from the record that there is a lack of uniformity in the testimony and opinions expressed by various witnesses, including Mr. Scutieri, and Carl Stinson, president and general superintendent, respectively, of plaintiff; and Messrs. Dickson and Hayes, project engineer and chief inspector, respectively, for defendant. Each witness identified the areas of sheeting in dispute by station, and testified from memory after reference to numerous pictures which were filed as exhibits. Plaintiff found the driving more difficult in some areas than others and would adopt *63 the procedure or technique deemed necessary to obtain the desired result. In each instance where plaintiff claims payment for type “A” sheeting, defendant’s witnesses Dickson and Hayes admitted that plaintiff placed the so-called box of continuous diaphragm sheeting and drove some of the distance in advance of clamshell or hand excavation before reaching the bottom of the trench. The difference in cost between the amounts bid for type “A” of $2 and for type “B” of 30 cents is material. There is agreement by all concerned as to the amount of sheeting placed in the disputed areas and that some clamshell or hand excavation was performed. The amount of sheeting involved is 19,015.54 square feet, computed from defendant’s exhibit 12, for which plaintiff was paid 30 cents per square foot under the designation of type “B” assigned by defendant. Plaintiff claims $2 per square foot, alleging it met the definition and characteristics of type “A” sheeting.
16. Plaintiff is also claiming an additional 87 days of contract completion time because of placement of additional type “A” sheeting far in excess of the quantities originally estimated by the defendant. Such placement required a longer period of time than would have been required for placement of the amount of such sheeting set forth in the contract estimate. Based upon experience at the site, plaintiff found that an average of 20 linear feet of type “A” sheeting could be placed in one day. The original contract estimate called for 378 feet of type “A” sheeting, whereas 2,702 of this type was placed, or 2,324 more linear feet than originally contemplated. Type “B” sheeting was estimated at 581 feet. Therefore, subtracting the two amounts (378 and 581) estimated from the amount placed (2,702), it is found that the contractor installed 1,743 additional linear feet of sheeting. Experience on the site of the work indicated that approximately 100 linear feet of type “B” work could be performed per day, or some 266 cubic yards. Di-. viding the additional footage placed by the determined rate of progress of 20 linear feet per day, it would require 87 additional days to perform the work involved.
17. The work involved under this item of the contract was the first phase of a large flood-protection project located in *64 the Cumberland, Maryland — Eidgley, West Virginia, area. The principal features of this phase were the construction of (1) pressure conduits at four streets: Franklin, Pear, Knox, and Wineow; (2) sanitary sewers in connection with the pressure conduits; and (&) reinforced concrete and brick manholes and inlets.
18. In the construction of pressure conduits it was necessary to provide for excavation 'and protection of the work and property adjacent to the work.
Protection of work and property during excavation is obtained by use of sheeting and shoring. A larger measure of protection to property adjacent to excavation work is afforded by driving the sheeting before excavation, to prevent any lateral pressure which might have the effect of cracking or causing the collapse of a wall of a building. Where this danger does not exist, sheeting is normally placed after excavation to grade, the sheeting being placed in a continuous diaphragm or at wider intervals (known as “open” or “butterfly” sheeting), depending on the protection required.
19. The Safety Manual of the Corps of Engineers does not mention “A” or “B” sheeting, but merely describes the conventional classifications of “open” as opposed to “continuous” sheeting and prescribes when each classification shall be used for purposes of safety to personnel and structures. There is no mention of driving sheeting in advance of excavation, which is the special distinguishing requirement for “A” sheeting in the specifications of this contract.
The parties agree that the specifications for sheeting and shoring as contained in the contract were unusual. But defendant insists that it had the contractual right to specify a unique type of sheeting, arbitrarily designated “A”, “B”, and “C”, and that the plaintiff had the contractual duty to comply with all the specified requirements for “A” sheeting in order to earn the payment agreed on for “A” sheeting.
20. It appears that plaintiff understood that type “A” sheeting was to be driven. In a letter from plaintiff to Dis *65 trict Engineer dated March 8, 1949, it was stated, in part, as follows:
As to the type of sheeting to be required on the Franklin St. conduit, we win use type “A” sheeting where we anticipate danger of sliding or cave-ins, and where we are to protect buildings, utilities etc., and where it is necessary to drive the sheeting.
Type “B” will be used where there is no danger of sliding, and where it will not be necessary to drive the sheeting. * * *
By letter dated March 29, 1949, plaintiff further stated, in part:
g. TP l-03a. (1) Type “A” — We are complying with these requirements and wish to state that type “A” sheeting is sheeting which is necessary to be driven to the required depth (as we are doing).
On April 2, 1949, plaintiff again wrote to the Corps of Engineers:
% ifi
* * * We are doing everything possible to do away with type “A” Sheeting because it hampers our progress and as stated to you before, we are anxious to get away from Sheeting altogether if possible, and thereby saving that expense to us and the government. As a matter of fact, we are now sloping our ditches to a safe condition and eliminating type “A” Sheeting. Further, had we not been able to slope these ditches, we would have had to use type A Sheeting throughout the Franklin Street Conduit, because of the necessary driving & clam-shell.
This is to advise that we have used type “A” Sheeting and should be paid as such. We are trying to be fair not only to the Government but to ourselves. We had no alternative than to do this work in this manner. Your attention is directed to your specifications TP 103 paragraph (1) Type “A” shall be used at locations where in order to PROVIDE ADEQUATE PROTECTION it is NECESSARY TO DRIVE a continuous diaphragm of timber sheeting to the required depth in advance of excavation and to support such sheeting in place with whaling [sic] bracing and shoring as the excavation progresses. This we have done. It was absolutely necessary to drive. It was impossible to do the work any other way, and we had to provide adequate protection.
*66 Paragraph (2) Type “B” Sheeting and Shoring shall be used where and as directed by the Contracting Officer in lieu of type “A” in all area WHERE N0 DANGER OF SLIDING OR CAVING IN is anticipated during excavation operations. Had we kept our excavations as to the required pay lines, we would have created a very dangerous sliding and therefore were absolutely required to drive the sheeting as called for— NAMELY TYPE “A”.
As understood and agreed, we will place type “B” Sheeting where there is no danger of slide-ins. Where it is not necessary to drive. And where we will not be required to clamshell the excavation. This we have agreed on.
All of these above operations not required in type “B” Sheeting are required in type “A” which we have done and completed.
«f»
21. Plaintiff subsequently took a different view concerning the use and manner of placing “A” sheeting. He sought to obtain payment of the contract unit price of $2 per square foot wherever a continuous diaphragm was placed, even though he did not drive to the required depth in advance of excavation. In answer to the Resident Engineer’s decision that the sheeting on Knox Street between stations 4 — 05 and 5-00 had not been placed in a mamier to permit payment for type “A” sheeting as specified, plaintiff, on June 8, 1949, wrote to the Resident Engineer, in part, as follows:
It is our opinion that the Type “A” Sheeting placed in this area complies with all the requirements for the following reasons:
1. It was ordered.
2. It is a continuous type as required in Type “A”.
3. Type “B” is not a continuous type.
4. The work was done in a practical and workmanlike manner.
5. It meets with all the requirements for which this Type “A” sheeting was intended.
6. This sheeting, we believe, will serve its purpose until removed.
7. We guarantee this work to do all the above and therefore, we are still responsible if any failures occur.
Since we have done all this work and guarantee same, we are entitled to Type “A” Sheeting in this area.
*67 22. The authorized representatives of the contracting officer on the contract were D. E. Mather, Besident Engineer, and Thomas E. Dickson, Project Engineer. Mr. Mather, who has retired from the Corps of Engineers, was unable to testify at the trial because of illness and the parties have agreed that his testimony at the hearing before the Corps of Engineers Claims and Appeals Board, held in March 1951, would be accepted for the purpose of the present trial.
Prior to the time of the Board hearing, Mr. Mather, a graduate in civil engineering of the University of Illinois, had 23y2 years’ experience in the Corps of Engineers, with a background of supervising large flood-control projects.
23. Soon after the work was started under the contract, the contracting officer’s representatives advised the plaintiff that payment for type “A” sheeting was not allowable unless there was compliance with the contract requirements.
On March 31,1949, Mr. P. C. Dorr, the Chief of the Construction Division in the office of the contracting officer, wrote plaintiff as follows:
Beference is made to your letter of 22 March 1949 relative to use of Type “A” and Type “B” sheeting. As per conversation in your office on 21 March 1949, it was agreed that Type “A” sheeting was to be used across North Mechanic Street.
This office does not consider the sheeting installed by you from station 1+03 to 1 + 63 as Type “A” and payment for this sheeting will be made under unit price 3 — B.
Your attention is again directed to specifications, paragraph TP-1-03, sheeting must be placed in accordance with specification requirements or as directed by the Contracting Officer or his representative at the job site.
■ 24. On April 6, 1949, Mr. Dickson, the Project Engineer, wrote to plaintiff, stating, in part, as follows:
The sequence of placement for the Type sheeting placed will be taken into consideration as to which type of sheeting is to be paid for.
As to what definitely is classed as type “A” sheeting this office stands on the ruling as stated in the letters from Mr. Dorr, Chief, Construction Division 23 Mar. 1949 and D. Mather, Besident Engineer, 29 Mar. 1949 to your corporation.
*68 25. On May 12, 1949, the contracting officer instructed plaintiff as follows:
‡ *
The basic controlling difference as stated in the specifications between Type “A” and Type “B” is that Type “A” sheeting is driven before excavation and Type “B” is for placing after excavation has been made. This requirement simply means that to the extent practicable the sheeting will be driven in advance of excavation. As a practical matter it may. be necessary at times in the Type “A” sheeting locations to excavate boulders and debris which prevent driving of the sheeting in advance of excavation.
A careful analysis of the specifications for requirements of Type “B” sheeting clearly shows that under this type the sheeting required to be placed after excavation must be adequate for protection of the work and adjacent structures. This may vary from a continuous sheeting to a system of open bracing, all of which is dependent on field conditions determined as the work progresses.
Under the requirements of the specifications, paragraph l.-3b, you will submit design and schedule of safe operational placing for sheeting and shoring for approval, that you consider adequate to provide the required protection in the various sections of the job. Mr. U. E. Mather, my delegated representative, will give you decisions on the design and schedules submitted, which must be received prior to commencement of the work.
It must be emphasized that the job must proceed in accordance with the requirements of the specifications in order to provide adequate protection for the structures, work and personnel.
26. On June 7, 1949, Mr. Mather, the Resident Engineer, in the course of enumerating the instances in which it was considered that plaintiff had failed to comply with the specifications, instructed him in the method to be used in type “A” sheeting when an obstruction was encountered which might affect driving ahead of excavation as follows:
d. Meanwhile, and if sheet piling drive to refusal before the full depth of their required penetration is reached, if the material is not too saturated for this *69 purpose, in digging down to determine the cause, the bottom ends of not more than two sheet piles shall be uncovered at one time. When the obstruction is removed, one sheet piling shall be driven at a time, and the void behind it back-packed from the opening under the adjacent pile. Repeat this operation until all the piles that drove to refusal have been cleared, driven down, and back-packed.
$ * * * *
27. The parties are in substantial agreement that at all locations where plaintiff claims payment for “A” sheeting, a continuous diaphragm, as opposed to “butterfly” sheeting was placed. However, there was sharp disagreement as to the sequence of operations. Government witnesses testified that plaintiff drove ahead of excavation at only four locations: Knox Street, Stations 6 plus 20 to 6 plus 90; Knox Street, Stations 9 plus 09 to 9 plus 90; Wineow Street, Stations 2 plus 30 to 4 plus 28; and one location on Franklin Street. At these locations plaintiff was paid for type “A” sheeting and at certain other locations for type “A” sheeting although it was not placed in correct sequence, because the work done was difficult or extra care was required.
28. Type “A” sheeting was placed and has been paid for at the unit price of $2 for 22,371.12 square feet; and 32,163.88 square feet of type “B” sheeting was placed and has been paid for at the unit price of 30 cents per square foot.
29. The Army Engineers Board of Claims and Appeals decision states, in part:
Considerable record has been studied as to the propo* interpretation of the applicable contract provisions with respect to the requirements of Types “A” and “B” sheeting. It is the opinion of this Board that Type “A” sheeting must be driven prior to excavation, to the extent practicable, and must be driven so as to afford a continuous diaphragm. Type “B” sheeting is that placed after excavation and the sheeting must be sufficient to afford adequate protection to the work as well as structures located nearby. Type “B” sheeting under the contract specifications may vary from widely separated sheeting to as much as a continuous diaphragm (paragraph TP 1-03 of the contract specifications). It is not the intent of these specifications to require the contractor to drive timber through pave *70 ment, boulders and debris. However, it is the intent to have at all times, when practicable, sufficient protection to the toe of the sheeting to insure against a slide or cave-in. To secure such protection, this appellant offered, and the Government accepted, a bid price nearly seven times that quoted for the method of sheeting which was to be placed after excavation. To permit the appellant to excavate and then place sheeting — whether continuous diaphragm or not — would be proper only in those instances where Type “B” sheeting had been ordered, and where payment for this type was to be made. * * *
ITEM B (1). ADDITIONAL EXCAVATION EOR TYPE “a” AND TYPE “b” SHEETING
30. The contract in suit provided for a unit price of $3 per cubic yard for excavation. An estimated quantity of 13,000 cubic yards was included in the contract unit price schedule and plaintiff bid on this estimated quantity. The final quantity of excavation was 13,473 cubic yards. Plaintiff was paid $40,419 for a total of 13,473 cubic yards of excavation at the contract price of $3.
The unit price for excavation in the contract is for the so-called “unclassified” excavation. No distinction in price is made with respect to such excavation for type of equipment used or for excavation in connection with type “A” sheeting, excavation in connection with type “B” sheeting or excavation where there was no sheeting to be placed.
31. Plaintiff contends that excavation in connection with type “A” sheeting is exclusively a crane operation as contrasted with backhoe excavation' which it claims is used for type “B” sheeting. More than one type of equipment was used in excavation performed in connection with type “A” sheeting and with type “B”, i.e., excavation in connection with placing of type “A” sheeting and also type “B” sheeting requires the use of clamshell, backhoe, or bulldozer.
32. Defendant estimated that the prices set opposite each type of excavation listed were reasonable for the type of excavation at the time it was performed. Plaintiff has accepted as reasonable the estimated prices listed in the following chart for the type of excavation indicated:
*71 Type of excavation Estimated price
Backhoe.. $2
5
1
excavation 8
Defendant has further shown, from the payment records, that plaintiff was paid for 22,371 square feet of what defendant classified as type “A” sheeting and 32,164 square feet of what defendant classified as type “B” sheeting. Plaintiff placed an additional 19,015.54 square feet of type “A” sheeting as shown by finding 15. In order to adjust the type of excavation to the revised ratio of 41,387 square feet of type “A” sheeting actually placed to the 13,148 square feet of type “B” sheeting placed, appropriate percentage adjustments should be made in the quantities of backhoe excavation to crane excavation because it was necessary to use crane excavation for the type “A” sheeting as contrasted with the backhoe excavation for type “B”.
The claim for crane excavation is not supported by the record, if we accept plaintiff’s proof, which shows that the backhoe was used to excavate to a depth of four to six feet prior to placing any sheeting and when the earth was found to be stable, plaintiff would then excavate to the entire depth by backhoe. If the earth was found to be unstable at the four- to six-foot depth, plaintiff would then place sheeting beginning at this depth. If the average cut was about nine feet, as indicated by the evidence, at least one-half of the portion claimed to be crane excavation was excavated with the backhoe. This would indicate that at least half, or 4,783 of the 9,566 cubic yards claimed as crane excavation, was actually excavated with the backhoe. This would leave 4,783 cubic yards of crane excavation and increase backhoe excavation by 4,783 cubic yards, which, when added to the 1,428 cubic yards plaintiff admits were excavated with the backhoe in the type “B” sheeting areas, would equal 6,211 cubic yards total for backhoe excavation. These computations and the manner of arriving at them appear to be a fair and reasonable solution with respect to Item B(l).
The following is a schedule with respect to (1) excavation provided in the contract, (2) plaintiff’s claim that, because *72 of unexpected instability of the soil, plaintiff should be paid on the basis of the type of excavation performed, rather than for average price as bid and called for under this contract, and (3) defendant’s estimate of excavation performed.
CONTRACT
Type Unit price bid Est. cubic yards Est. cost Actual cubic yards Actual amount paid
Excavation (unclassified). $3 13,000 $39,000 13,473 $40,419
PLAINTIFF (AS REVISED) DEFENDANT
Type Unit price Cubic yards Amount Unit price Cubic yards Amount
Backboe_ 1,428 $2,856 5,366 $10,732
Crane_ 9,566 47,830 6,122 25,610
Bulldozer.. 1,320 1,320 1,320 1,320
Hand_ 1,159 9,272 1,159 9,272
Total.. 13,473 61,278 12,967 [1]46,934
33. Plaintiff’s proof does not support a finding of entitlement to compensation for the total amount claimed for crane excavation.
It is found that approximately one half of the excavation accomplished in those locations where continuous diaphragm sheeting was installed was accomplished by use of the backhoe.
It is further found that a fair and reasonable computation of the work performed and the cost thereof under this heading is as follows:
Unit price Cubic yards Amount Type
6,211 $12,422 Backhoe.._
4,783 23,915 Crane..
1,320 Bulldozer.. _
1,159 9,272 Hand excavation.
Total_
Since plaintiff was paid $40,419, an additional amount ($6,510) would be due plaintiff under this item should a decision be reached that payment should be made on the *73 basis of the type of excavation utilized because of the unexpected instability of the soil which was encountered.
ITEM B(2). CLAIM FOR EXTRA EXCAVATION
34. Plaintiff claims payment at the rate of type “A” sheeting for over-excavation in the area between stations 3 plus 20 and 4 plus 05 on Knox Street and stations 1 plus 44 and 2 plus 30 on Wineow Street. In these areas plaintiff excavated beyond the neat lines ordered, and its charge is computed on its estimate of the number of feet over-excavated. Mr. Scutieri testified there was a tendency of the ground to slide, and he open-cut the ground in order to try to put in type “B” sheeting, but this did not work, so he over-cut the slopes in order to accomplish his purpose. Defendant did not order or approve slopes beyond the neat lines. Mr. Scutieri testified that he subtracted the difference between the cost of type “A” and type “B” sheeting and considered that this would be a fair cost for his over-excavation. Although defendant denied any responsibility for such claim, it appears to be reasonable for the work performed.
35. The amount of $8,488 is claimed for over-excavation of 4,244 square feet at the “A” rate of $2 per square foot, but plaintiff has already been paid at the “B” rate of 30 cents per square foot. It is logical and proper, if plaintiff’s claim of cost is based upon type “A” sheeting, that credit be allowed for the prior payment of 30 cents per square foot for “B” sheeting. The claim for $2 per square foot should be changed, accordingly, to $1.70. The total for this item would be $7,214.80.
36. The decision of the Army Engineers’ Claims and Appeals Board referring to this claim states:
*' * * * *
As to those instances in Wineow and Knox Streets, where claims are filed for reimbursement for additional grading, this Board finds that there has been nó showing that the contracting officer directed the side sloping of the excavation in lieu of sheeting. With respect to the extra grading on Knox Street, the contracting officer finds, and no showing has been made to support a contrary view, that the removal of this material was not directed. Under such circumstances, claim for' the *74 additional excavation at these two points can not be allowed.
*****
ITEM O. UNDERPINNING
37. Plaintiff claims under this item 26% days’ extension of time and additional cost of $11,892.25.
The station Knox Street 6 plus 20 to 6 plus 90 was on one of the main thoroughfares in the city of Cumberland. It was necessary for the work on the project in this area to be done across Center Street in a manner which permitted traffic to be maintained while the work was going on. In addition there were railroad abutments and buildings very close to the excavation area, making it necessary that great care be exercised to make certain that they were adequately supported while the work was going on. The distance across, including both sidewalks, was 24 feet, with a trench 9 feet long in the center of the street. The work was different from most stations because of the very close quarters in which the work had to be performed.
38. Because of the narrow street, nearby traffic, abutting buildings, and railroad, the contracting officer of defendant maintained close supervision of the work as it progressed. He had authority, under the contract, to require the type of work which he considered necessary to accomplish the job. Defendant refused to authorize plaintiff to resort to use of underpinning to protect the adjacent buildings, etc. Type “A” sheeting was authorized, placed, and paid for.
39. Because of the street conditions referred to in findings 37 and 38, the excavation and placing of the sheeting at this station took longer than at other stations on the job. Government records show that the complete excavation and placing of the sheeting took 17 days. The plaintiff was working two shifts at this station, which would mean that this work took the equivalent of 34 days. Plaintiff has made claim for remission of 26% days because of the conditions under which the work had to be performed.
40. There is no specific proof to show what would have been the cost of underpinning had it been used, or that its use would have been substantially less expensive for plaintiff.
There is no detailed proof as to the amount of additional *75 cost of operation in the nature of labor, equipment, or overhead, except for plaintiff’s contention there was more time consumed at this station than usual; that the work took approximately 40 days; and that work progress throughout other sections of sheeting work would indicate a normal period of 10 days for completing the work in this area.
It is not established by the record that the actions or requirements of defendant with respect to this work were arbitrary or capricious, but the record supports a finding that some extra cost and additional time were required of plaintiff in order to perform this phase of the project in line with the demands of defendant.
ITEM D. TRAP ROCK
41. Item 7 of the unit price schedule is entitled “Backing for Dumped Kiprap and Pipe Bedding.” The estimated quantity was 30 cubic yards at $10 per cubic yard.
42. The specifications provide for stone protection and the purpose of its use in TP 3-01:
80 OPE. The work covered by this section consists of furnishing all plant, labor, equipment, and materials, and performing all operations in connection with the construction of stone protection for the slopes at the locations shown on the drawings or as directed by the Contracting Officer in accordance with these specifications and applicable drawings.
TP 3-02, subdivision a, provides that stone to be used shall be approved by the contracting officer and be delivered for testing 60 days in advance of the time of the placing.
Subdivision 5, entitled “Biprap,” provides:
Stone for dumped riprap shall weigh not .more than 250 pounds, shall be block shaped and not more than 35 percent of the whole shall be formed of pieces weighing less than 100 pounds, and not more than 10 percent of the whole shall be formed of pieces weighing less than 25 pounds which shall be evenly distributed throughout the mass. Pieces of stone having an average thickness less than % of the average piece will be considered as unsuitable for this work.
Subdivision c provides for backing material which shall consist of 25-75 mixture of fine and coarse aggregates con *76 forming to the requirements for aggregates appearing in section 4 of the specifications which relate to concrete. TP 3-04 a relates to backing material, and states:
General. Backing material conforming to the requirements specified in subparagraph TP 3-02 p shall be placed within the limits shown on the drawings or as staked in the field, to form a backing for the-stone protection.
Subdivisions b and e provide for the placement and measurement, which are to be in accordance with the limit lines as shown on the drawings or staked in the field.
Subdivision d states:
Payment. Payment for backing material will be made at the contract price per cubic yard for Item No. 7, “Backing for Dumped Riprap and Pipe Bedding”, which price shall include all costs of furnishing, hauling, placing, and maintenance of the backing material until placement’of the dumped riprap cover is completed and accepted. No payment will be made for excess thickness of filter blanket nor for material required to replace embankment material lost by rain wash, wind erosion, or otherwise, except for additional filter material ordered in writing by the Contracting Officer.
43. No use of trap rock or aggregate for taking care of water conditions was authorized by the contracting officer. It is apparent from the above-quoted specifications that the material therein described was intended to be used to back up holes or voids made or uncovered during excavation, and that this type of stone was not intended to be used in lieu of dewatering.
See also Specifications SC-23, quoted in finding 60.
44. During the excavation at Pear, Wineow, and Knox Streets, there were occasions when plaintiff muddied the bottom of the trench and had to excavate beyond the grade site which was authorized or required. There were other occasions when plaintiff, having excavated to a minimum grade, encountered an unsuitable soil material due to muck or mire, and was required to go beyond that line for a foot or two. Plaintiff then backfilled with the gravel which came out of the excavation, and the defendant paid for the excavation and the compacted backfill under applicable pay items. *77 A typical action of this type occurred on the Wineow Street location. In March 1949 when Dickson arrived at the job and became the contracting officer’s representative in this job, he observed that the contractor had placed a fine layer of trap rock at the bottom of the trench being excavated.
Dickson notified Mr. Scutieri, plaintiff’s president, that there was no payment item for reimbursing plaintiff for putting trap rock at the bottom of the trench. Scutieri claimed that it was necessary to drain water. There was water in some places excavated. This was caused by rain or normal water table.
Dickson suggested that he could place a small ditch on either side of his excavation grade to drain the water. Dickson informed Scutieri that the defendant had not ordered, or would not be responsible to pay for the trap rock he was placing at the bottom of the trench; that the dewatering of the trench was plaintiff’s responsibility; that estimate item 7 was for backing, for dump riprap, and pipe bedding. At that time, plaintiff took no appeal to the contracting officer, but accepted Dickson’s suggestion and ditched on each side of the trench.
45. Plaintiff was paid for the placing of 21.43 cubic yards of riprap backing on Wineow, Franklin, Pear, and Knox Streets, but plaintiff claims to have placed this type of bedding on the whole area of Wineow, Franklin, Pear, and Knox in addition to the places designated. The defendant did not order the trap rock for which plaintiff claims reimbursement. Plaintiff claims that it placed 2,973 linear feet of trap rock and asks that it be paid at the rate of $3 per foot, a total of $8,919.
The record does not establish that placing of the additional trap rock was authorized either by the contract or by the defendant’s representatives.
46. This claim was presented to the Corps of Engineers Claims and Appeals Board. Evidence was there given that the trap rock was neither directed nor necessary to be used; that the same result could have been obtained from less costly operations; that the appellant did not keep its pumps working in the area and that adequate dewatering was not accomplished. The Board held that:
*78 * * There, is no showing of any “changed condition” or other cause pursuant to which payment could be made. On the contrary, it appears that the wet condition in the base of the excavation was the direct result of insufficient pumping and, in the light of the contract provisions requiring appellant to construct all permanent structures in the dry (SC-23 — Unwatering Work Areas), no payment for this rock may be authorized.
ITEM E. COARSE AGGREGATE FOR CEMENT (CONCRETE)
47. The only claim made under this item is for a time extension of 72 days. The contract and specifications from which plaintiff made its estimate and bid, Section IY, TP 4-07(b)(3), provided that the coarse aggregate to be included in the concrete should be submitted for testing to the contracting officer 35 days prior to use on the job. Provision was also made for the testing of the cement to be used in accordance with the specifications. Mr. Scutieri was provided with plans which accompanied the specifications for the local flood protection project involved here. The exhibit contained twelve sheets which included, among others, Sheet No. 1, flood lines and location of subsurface explorations; Sheet No. 3, general plan and sheet index. Sheet No. 1 showed flood line markings of prior floods in 1924 and 1936 in the area of the work to be performed by plaintiff. Sheet No. 2 showed drawings of findings made as a result of boring either by core or auger in each area where the contract provided that excavation and other work were to be done.
The contract contained the following provisions with respect to the physical data and the availability of materials for coarse and fine aggregate for concrete:
SC-7. PHYSICAL DATA. The information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interpretation or conclusion drawn therefrom by the Contractor.
* ❖ * * ❖
e. Concrete Aggregates. Such investigations as have been made indicate that suitable stone is available for *79 coarse aggregate within a radius of five miles of the work. Materials for use as fine aggregate have not been located in the immediate vicinity of the project.
48. The scope of the work included the placing of substantial quantities of concrete (coarse aggregate, cement, and water). The contract provisions relating to this phase provided, in part:
SECTION IV. CONCRETE
TP 4-01. SCOPE OF THE WORK. The work covered by this Section consists of furnishing all material and equipment and performing all labor for the manufacture, transporting, placing, finishing, and curing of concrete in the structures included in these specifications.
TP 4-02. COMPOSITION. Concrete shall be composed of Portland cement, water, fine and coarse aggregate, and an air-entraining admixture. The design of concrete mixtures will be based on the water-cement ratio necessary to secure (a) a plastic, workable mixture suitable for the specific conditions or placement and (b), when properly cured, a product having durability, impermeability, and strength in accordance with all the requirements of the structures covered by these Specifications. The mixtures will be designed by the Con-
TP WATER CONTENT. The water content of all concrete mixtures shall be the minimum necessary to properly place the mixture being used.
TP 4-04. CEMENT, a. General. Bulk cement shall be used for all major work, except as otherwise approved by the Contracting Officer. Cement necessary for grouting, finishing, and patching purposes may be packaged. For any work in which the volume of concrete is too small to justify the necessary facilities for the handling and storage of bulk cement, cement may be furnished in cloth or paper bags.
6. Portland Cement. Portland cement shall conform to Federal Specifications SS-C-192, Type II or Type
* * * * *
d. Special Test Requirements. Cement will be sampled at the mill and/or at the site of the work. All tests will be made by, or under the supervision of the Government and at its expense. No cement shall be used until notice has been given by the Contracting *80 Officer that the test results are satisfactory. If tests prove that a cement which has been delivered is unsatisfactory, it shall be promptly removed from the site of the work.
$ $ ‡ ‡ *
TP 4-07. 00ARSE AGGREGATE, a. Composition. Coarse aggregate shall consist of gravel, crushed gravel, stone or a combination thereof, or blast furnace slag.
b. Quality. Coarse aggregate shall consist of hard, tough, durable and uncoated particles. The equipment and plant used in the production of coarse-aggregate shall be designed for the production of aggregate conforming with the requirements of these Specifications. When crushed aggregate is furnished,' the dust shall be removed by adequate washing. The particle shape of the smallest size of crushed coarse aggregate shall be generally rounded or cubical, and the tolerance of flat and elongated particles in all sizes of the coarse aggregate shall be governed by the inherent placeability requirements of the structure in which the mixture is to be placed. A thin, flat and elongated particle is defined as a particle having a maximum dimension greater than five times the minimum dimension. Aggregate which has disintegrated or weathered badly, under exposure conditions similar to those which will be encountered by the structures under consideration, shall not be used. The coarse aggregate shall conform to the following specific requirements:
(1) Grading. The coarse aggregate shall be well graded from fme to coarse. It shall be separated in the following specific size groups or on other sieves common to local practice which will provide the required number of separations and adequate control of the grading. The grading of the aggregate within the separated size groups shall be as follows:
Percent by weight passing individual sieves
Sieve size U.S. standard square mesh
No. 4 to «inch «to PA inches
PA inches. 90-100
1 inch_ 20-45
« inch_ 90-100 0-10
% inch_ 30-55 0-5
No. 4_ 0-5
*81 The maximum size of coarse aggregate to be used in the various parts of the work shall be 1 y2 inches.
(2) Soundness. Suitable tests and the service record will be used to determine the acceptability of the coarse aggregate. In the event suitable tests and a service record, that are satisfactory to the Contracting Officer, are not available, as in the case of newly operated sources, the coarse aggregate shall be subjected to such tests as are necessary to determine the acceptability for use in concrete for the proposed structure. The tests to which the aggregate will be subjected will include specific gravity, absorption, Los Angeles Abrasion, soundness in magnesium sulphate, petrographic analyses, freezing and thawing in concrete, alkali-aggregate reaction, and any other tests that are necessary to demonstrate that concrete of acceptable durability over a long period of years can be produced.
(3) Sampling. All sampling of coarse aggregate shall be in accordance with Federal Specifications SSA-281a, or as directed by the Contracting Officer. The source from which coarse aggregate is to be obtained shall be selected well in advance of the time when the material will be required in the work. Adequate samples of coarse aggregate for all required tests shall be furnished at a point designated by the Contracting Officer at least thirty five (35) days in advance of the time when the placing of the concrete is expected to begin. * * *
49. Plaintiff was aware of the importance and desirability of securing its cement and coarse aggregate for the concrete as soon as possible. Scutieri testified that he could not start the work until he had made arrangements for the necessary concrete since it was necessary to pour it promptly after doing the excavation and the trenching.
Scutieri, sole owner of plaintiff corporation, was the president and general manager. He testified that he walked over the entire project prior to bidding; that he sought to secure coarse aggregate within a five-mile radius of the instant project, but was unable to do so. He did not consult the Army Engineers, although bidders were invited to examine material at defendant’s laboratories as to subsurface conditions.
Early in August 1948, Mr. Scutieri telephoned the Cumberland Cement and Supply Company of Cumberland, Mary *82 land, and talked to its president, Mr. George K. Steiner, requesting a bid on ready-mixed concrete for the instant flood control project. Scutieri did not describe the contract specifications relating to concrete when he talked to Steiner.
50. On August 13, 1948, Mr. Steiner wrote plaintiff as follows:
At the request of your Mr. Scutieri, we are pleased to quote you a price of:
$12.50 per cu. yard, 6 bag cement content, ready mixed concrete, delivered in Cumberland, Md. Please advise us if we can be of further service.
We would be pleased to name you a price hauled with your own ready mixed trucks, if you have some. Can give you price on gravel, sand and bulk cement, with water charge at our bins in Cumberland.
*****
WORK: Flood control.
QUANTITY: Approx. 1,800 cub. yds.
Above prices are truck lots delivered via our trucks.
ACCEPTANCE: This quotation is for your acceptance within_days from date hereof, and subject to freight rate advance or decrease.
GENERAL:
CONDITIONS: It is understood that the “General Conditions” printed on the reverse side of this form are considered a part of this quotation.
51. Steiner having heard that plaintiff’s bid for the instant job was accepted, wrote plaintiff a letter of October 8, 1948, which stated, in part:
We were pleased to hear of the award to your Company of the pressure conduits in connection with flood control work in Cumberland.
Had the pleasure of quoting you on Aug. 13th by mail at the request of your Mr. Scutieri, who was in Cumberland.
Did you find our prices attractive? We had some indirect word that our own local materials were not entirely approved by the Engineers. This may be false, but we would like to know if you have any advice on this subject. As our materials have been used for a long period of years on State Highway work and a number of other bridges and structures in Cumberland and vicinity, we are at a loss to understand this, if true.
*83 If you are interested in' using our materials, and if there is anything to this matter of non-approval, we would like your permission to proceed further with it, and suggestions as to whom we should contact about the matter.
52. Mr. Steiner intended to supply river gravel to plaintiff for coarse aggregate, and made his price quotation of $12.50 per cubic yard accordingly. Steiner gave Scutieri a sample of this stone.
The Corps of Engineers had made two tests in early 1948 of Steiner’s river gravel, not at his request. Steiner had been informally notified that the material was not satisfactory from the tested samples.
Steiner then submitted a sample of the river gravel and on December 11, 1948, Steiner went to Washington, D.C., to the office of Mr. Edmund E. Preece, who was Chief of the Laboratory of the Civil Engineering Board of the Army Engineers, in order to inquire concerning the tests of river gravel he had submitted. Steiner asked what he could do to meet requirements and was told he might 'be able to process the material and remove soft materials. He never offered a new sample.
In January 1949, Preece had a telephone conversation with Steiner who told him that he had been unable to reprocess the stockpile because the river was too high. He asked if Preece could approve it as it stood, and Preece stated he could not, because it did not meet specifications.
53. Plaintiff relied on the offer of Steiner to furnish it concrete and expected to get concrete up to the contract specifications because Steiner’s quotation referred to 1,840 cubic yards of concrete for flood control, this being the amount of concrete estimated in the contract.
Plaintiff and Steiner conducted further negotiations concerning additional cost to the plaintiff if Steiner was required to furnish stone for coarse aggregate other than river gravel which had been the basis of his bid theretofore submitted. On January 15, 1949, Steiner wrote a letter to the plaintiff referring to negotiations with plaintiff which had been conducted on behalf of Steiner by Mr. Diehl. The letter stated, in part:
*84 As Mr. Diehl, to whom you have been talking about this matter, has advised you previously, we have no option in this matter but to make an additional charge for the additional cost of using out of town materials, if the engineers insist that this be done.
Our original quotation to you applies only on aggregate proposed from our local deposits. Any additional expense for other materials for ready mixed concrete is to be borne by you.
At no time did we advise you that our materials were approved by the U.S. Engineers for the proposed flood control. On Oct. 8, 1948 we wrote to you advising that we had heard there was some question of our material being approved for the local flood protection project.
We have done all we can to locate approved materials, as we have told you on the telephone, but we cannot supply out of town materials for $12.50 per cubic yard and would now appreciate your advising whether you wish us to continue in the proposition or not.
54. A few days after Steiner’s telephone conversation with Preece, in January 1949, Mr. Scutieri visited Preece. There is no evidence that plaintiff had contacted the Army Engineers during October, November, or December 1948 with respect to materials for ready-mixed concrete.
55. In addition to the Cumberland Cement and Supply Company (Mr. Steiner), in 1948 and 1949 there were two other quarries, the Sensabaugh and the Corriganville, within a radius of five miles of the project, which had suitable stone for coarse aggregate exposed. These quarries were equipped to fill orders. Both of these quarries supplied coarse aggregate to customers in 1948 and 1949 when they received orders, and the stone from these quarries met the specifications required by the contract involved in this action.
When there was difficulty in getting the river gravel accepted, Steiner advised Scutieri that stone for aggregate could be secured from Martinsville, West Virginia, which was outside the five-mile limit. Steiner did not advise plaintiff concerning the suitable stone which was available within the five-mile limit (1) from the Sensabaugh and Corrigan-ville quarries and (2) from Steiner’s own deposit (from which he later suppled stone for coarse aggregate), or agree *85 to furnish such stone to plaintiff until on or about March 1, 1949.
56. On February 10, 1949, Steiner submitted to the Army Engineers samples for testing from his Helderberg limestone deposit which was within the five-mile limit. These were approved as satisfactory under the contract specifications on March 1, 1949. Sensabaugh also submitted limestone samples from his quarry within the five-mile limit in January 1949 and these were also approved as satisfying the instant contract’s specifications for coarse aggregate. Steiner then agreed to and did supply stone for this project from his theretofore unused deposit, although this deposit and the Corriganville and Sensabaugh quarries were available and had suitable stone for coarse aggregate within the five-mile area.
57. Plaintiff poured the first concrete under the contract on March 7, 1949. This was more than four months after plaintiff had received the notice to commence, on October 13, 1948. Mr. Scutieri testified that he could not work on the project until concrete was supplied as it was necessary to pour it promptly when excavation had been made.
Plaintiff claims that its delay until March 7, 1949, in starting work was attributable to the defendant’s statement in the specifications that suitable stone for coarse aggregate was available within a radius of five miles of the project and this was misleading.
Prior to issuance of the specifications, which contained a statement that there was suitable stone for coarse aggregate within five miles of the project, the Engineers had sampled potential sources, had tests made, and knew that raw material that would meet the specifications was available there for coarse aggregate. The Engineers picked up samples from stockpiles and, where there was no operation going on, took representative fragments at the base. These included samples from three or four quarries which were not operating. Sensabaugh was not operating except as orders were received. Corriganville was operating or had a stockpile.
58. The delay encountered by plaintiff in starting work was, to some extent, occasioned by representations of the *86 defendant as to tbe availability of suitable stone for coarse aggregate. Some delay was experienced because plaintiff’s supplier did not promptly submit such stone to defendant for testing. The record also shows that plaintiff did not start work in accordance with the progress schedule. Plaintiff has not established entitlement to a total time extension of 72 days for completion of the work under Item E.
Plaintiff did not exert every reasonable effort to secure the coarse aggregate necessary for the concrete needed for work under the contract.
59. The contracting officer refused to find that plaintiff was entitled to a substantial number of days’ extension for completion on the contract because of plaintiff’s claim that delays were caused by the nonavailability of suitable stone for aggregate. An appeal was taken to the Corps of Engineers Claims and Appeals Board. Plaintiff asked for remission of liquidated damages of 70 days of its delay to complete the contract work within the time limit. In its decision in Claim No. 1 (Petition’s Claim “E”), based on substantial evidence, the Board stated, in part:
* * * [T]his Board finds that the specifications correctly stated the facts with respect to the availability of stone “suitable for coarse aggregate.” The Government did not represent that coarse aggregate was available, or that the stone for use in the aggregate had been processed. ^Representation was made that stone was available and the record shows that suitable stone was available, and subsequently secured by appellant’s supplier from a point three miles from the project site. * * *
ITEM G. FLOODS
60. The contract states it is for “Local Flood Protection Project, Pressure Conduits and Sewers — Group No. 1,” and the appropriation is stated to be “21X3113 — Flood Control General”.
The specifications provided:
SC-20. Damage, to work. The Contractor shall be responsible for all work until completion and final acceptance thereof. However, if, in the judgment of the Contracting Officer, any part of the permanent work performed by the Contractor is damaged by flood, which damage is not due to the failure of the Contractor to *87 take, reasonable precautions or to exercise sound engineering and construction practice in tbe conduct of tbe work, additional payment for tbe repair of sucb damaged permanent work as ordered by the Contracting Officer will be made at tbe applicable contract unit or lump sum prices as fixed and established in tbe contract, which shall be full compensation therefor. If, in the opinion of the Contracting Officer, there are no contract unit or lump sum prices applicable to a part of such work, an equitable adjustment pursuant to Article 3 Changes of the contract will be made as full compensation for the repairs of that part of the permanent work for which there are no applicable contract unit or lump sum prices. Except as herein provided, damage to all work, (including temporary construction) utilities, materials, equipment and plant shall be repaired to the satisfaction of the Contracting Officer at the Contractor’s expense, regardless of the cause of such damage.
SC-23. ÜNWATERINGWORK AREAS. Unless otherwise specifically authorized, all permanent structures shall be constructed “in the dry”. For this purpose the Contractor shall provide such cofferdams, diversion channels, drains, flumes or other temporary structures, and such pumps and other equipment as may be necessary for unwatering foundations and work areas. Such structures shall :be subject to the approval of the Contracting Officer, 'but such approval will not relieve the Contractor of responsibility for the adequacy of the work. Upon completion of the work all such temporary structures shall be removed from the site. Underdrains shall be plugged with concrete after serving the purpose for which intended. Separate payment will not be made ior pumping, providing and removing any temporary protective works and equipment specified above, and plugging underdrains, but the cost thereof shall be included in the contract unit prices for the various items of the permanent work.
61. The flood control project was built adjacent to the Potomac River and the C & O Canal. It was, in part, also adjacent to Wills Creek. The plaintiff took no adequate steps to protect its work from floods.
On Friday morning, June 18, 1949, a heavy rain fell in the area of the flood control project and continued through the next day, Saturday, the 19th. As a result of the rain, water backed up from the river into some of the trench excavations.
*88 On July 13,1949, another flood occurred as a result of high water from a heavy rain. This was caused by a drainage of surface water in the immediate vicinity of the project from the C & O Canal. The canal, which had been in existence many years, was intended to take care of drainage in the area. The plaintiff had placed an old smokestack about 30 inches in diameter on the bottom of the C & O Canal for the purpose of passing the water over the trenches he excavated underneath the C & O Canal in order that a project conduit could be constructed to empty into the Potomac River.
62. Concrete conduits were planned and placed in the trenches as a part of the flood control project. These were constructed in two parts, the lower part being the invert. Imbedded reinforced steel was used in forming the concrete walls. The forms, into which the concrete was placed, were not a part of the permanent structure and were removed after serving the purpose for which intended.
In excavating, dirt and other loose materials were left by plaintiff on top of the valance. This was washed by the floods into the construction together with silt and other debris. The damage done by the flood was that silt was poured into the concrete conduits, the reinforcing rods were bent and had to be straightened, and some forms were washed downstream.
63. On June 17, 1949, Dickson ascertained from the Weather Bureau that there would be heavy rains, and immediately notified plaintiff, warning of a possible flood. The defendant’s engineers did not specify the exact type of protection which should be placed, but warned that heavy water was expected.
On Friday, June 18, 1949, when rain was falling heavily at Wineow Street during the morning, most of plaintiff’s men were sent home. The contracting officer’s representative tried to contact Mr. Scutieri to inform him that he should take some steps to protect his project, but he was not at the jobsite. Plaintiff’s supervisor, Stinson, was contacted and informed that steps should be taken because of the heavy rain. Despite this warning, no appropriate steps were taken by plaintiff to protect the equipment and work.
*89 On the next day, June 19,1949, Stinson was again notified that he should take steps to protect the project. Stinson went down to the river where plaintiff had some pumps to try to remove them. This attempt was unsuccessful, as water was close to the top of the pumps. Stinson removed the magnetos from the pumps.
64. After the June 18-19,1949, flood at the end of Wineow Street, there was no indication that plaintiff had done anything prior to the flood to prevent inundation. Plaintiff should have followed the usual custom and put a built-up section at that point; he could have put a dirt levee or sandbagging to an elevation of about three or four feet in order to get the additional protection he needed. This is considered to be sound construction practice.
Plaintiff contends that it had taken dirt from the excavation and piled it on both sides of the excavation for several feet; that there was a higher area between its excavation work and the side of the river; that on the canal side plaintiff had one permanent pump and at times three or four pumps to take care of its surface water. Plaintiff also contends that building dikes would have given it no protection from the canal side and if it built a dike on the river side it would not have stopped the river water from entering the trenches.
65. The preponderance of evidence is that plaintiff failed to take adequate steps to guard the flood control project from flood water during excavation and performance of other work on the project.
66. The plaintiff presented its claims arising from the floods to the contracting officer, who denied payment. Plaintiff appealed to the Corps of Engineers Claims and Appeals Board. The Board affirmed the action taken by the contracting officer, stating, in part:
The record fails to disclose any action by the appellant in an attempt to protect the work from flood damage. % * ij«
A review of the record in this appeal relating to these flood claims discloses no basis for allowing additional payment due to damage caused by flash floods on the three dates set forth above. * * * This Board can not *90 conceive of an employee of the Corps of Engineers, by reason of his general experience, being more “flood-control conscious” with respect to a particular job than a contractor whose equipment and work are on a project immediately threatened by rising waters.
Upon full consideration of all the facts, no payment under this claim may be allowed.
ITEM II. MIXING TIME
67. Plaintiff claims the sum of $2,543.20 is due it because the defendant refused to allow plaintiff to mix its concrete in transit from its supplier to the location where the concrete was to be used. Plaintiff also contends that it lost the advantage of mixing while the concrete was in transit and that the batch would have been ready by the time it arrived at the site.
The contract specifications TP 4-105 “Mixing Time” provided :
The mixing time for each batch, after all solid materials are in the mixer drum, provided that all the mixing water shall be introduced before one-fourth (%) °f the mixing time has elapsed, shall be as follows:

Mvemg tome Minutes Capacity of miwer

Va cubic yard, or smaller_
% to 1 Vs cubic yards incl
2 and 3 cubic yards_
4 cubic yards_
The mixing periods specified are predicated on proper control of the speed of rotation of the mixer and of the introduction of the materials, including water, into the mixer. The mixing time may be increased when, in the opinion of the Contracting Officer, the charging and mixing operations fail to result in the required uniformity of composition and consistency of the concrete or when test samples of concrete taken from three locations, such as front, center, and back of the mixer show a difference of more than ten (10) percent in the sand-cement or water-cement ratios. * * *
The contract specifications further provided, with respect to special equipment:
c. Special Equipment. Where conditions of concrete placing are particularly adaptable to use of transit, truck, or agitator mixed concrete, such as at isolated sections of a project, this method of concrete manufac *91 ture and delivery will be authorized. The equipment and methods to be used shall be approved by the Contracting Officer in writing. Concrete, so manufactured, shall comply in every respect with these specifications. The Contracting Officer may, at any time, reduce the size of batches, adjust sequences, mixing time, or mixing speed, and make such changes as are deemed necessary to obtain concrete of the quality herein specified. Weighing and batching equipment shall conform specifically to requirements of paragraph TP 4-10, -10<z., (1), (2), (3), (4), (5), (6), (7), (8), (9), and (11), and except as covered therein, the use of such equipment for mixing and transporting concrete shall be in accordance with applicable portions of A.S.T.M. C 94
68. Plaintiff used Jaeger mixing trucks of a type shown in Joint Exhibit 18, a brochure prepared by the manufacturer of the Jaeger mixers. This brochure recommended mixing time of six minutes for new equipment. The equipment used in this job was old, and it took twelve minutes’ mixing time to get the quality required for the job. If there had been mixers that would have accomplished it in less time, the inspectors would have been satisfied with less mixing.
69. The basis of plaintiff’s claim is that the capacity for the 2y2- and 3-yard mixers under TP 4-105 should have required mixing time of only two minutes. Since the contracting officer’s representatives required plaintiff to mix anywhere from 8 to 12 minutes, plaintiff estimated its loss as the 10 minutes it was delayed in mixing each batch as a result of requirements established by defendant for mixing the concrete.
70. After the denial of the claim by the contracting officer, an appeal was taken to the Corps of Engineers Claims and Appeals Board. The Board denied the claim, stating, among other things:
* • * * The Government introduced evidence of the need for proper mixing, including the correct water-cement ratio; that the mixers used were old, and worn, and in generally poor condition, particularly as to the blades; that tests proved 12 minutes the minimum time thoroughly mixed concrete could be obtained without “dust explosion,” and larger stones coming out of the mixer last. Evidence was introduced to show that the appellant was informed of the poor condition of the mixers, *92 with a suggestion that it be taken up with supplier of concrete.
The Board further stated that the defendant had pointed out there was no contract obligation to have an inspector at the plant of plaintiff’s concrete supplier, and held that the actions of the contracting officer were necessary to procure a proper mixture of the concrete, and were taken only after the supplier of the concrete had given evidence of plaintiff’s inability or unwillingness to supervise its own personnel to the end that the mixing job would meet its concrete requirements.
71. The following is a summary of plaintiff’s claim:
Item Claimed by plaintiff Maximum deemed supported by substantial evidence
A. Sheeting and shoring (additional 87 days claimed)_ $32,326. 42 $32,326.42
B. (1) Additional excavation — Type “A”_ 30,863.40 6,610 00
C. Underpinning (cost) (additional 26M days claimed)_ 10,858.14 None
D. Trap rock. 8,919.00 None
E. Coarse aggregate (only time extension (72 days) claimed). None
G. Floods (cost). 4,736.38 None
Profit claimed__----— 451.08 None
H. Mixing time. 2,318.80 None
Profit claimed___ 224.40 None
Withheld by defendant (finding 4)_ 100.00 100.00
Liquidated damages.. 19,400.00 19,400.00
Total_ 119,709.73 65,551.22
Defendant has not agreed that any of these items should be accorded favorable consideration.
72. Plaintiff is claiming a total delay in connection with items A, C, and E of 185% days and liquidated damages for completion of the project. Eighty-seven days should have been allowed to complete the job in connection with item A.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover under its items A and B of its claim, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of twenty-three thousand, nine hundred ten dollars ($23,910),
*93 It is further concluded that plaintiff is not entitled to recover on the remaining items of its claim, and the petition as to those items is dismissed.

 The $1.70 represents the difference between type “A” at the unit price of $2 and type “B” at the unit price of 30 cents per sguare foot.

 Defendant’s addition of these amounts was $45,875, but this is an apparent error in addition made from the witness stand. The correct total is $46,934 as shown above.